# Supreme Court of Florida

————————

No. SC12-1386

————————

**STEVEN DOUGLAS HAYWARD,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

————————

No. SC13-1787

————————

**STEVEN DOUGLAS HAYWARD,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[June 25, 2015]

PER CURIAM.

Steven Douglas Hayward appeals an order of the circuit court denying his motion filed under Florida Rule of Criminal Procedure 3.851 to vacate his conviction of first-degree murder and sentence of death after an evidentiary

hearing on certain issues raised in the motion. He also petitions this Court for a writ of habeas corpus, alleging ineffective assistance of appellate counsel. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons set forth below, we affirm the denial of postconviction relief and deny his petition for a writ of habeas corpus.

## I. BACKGROUND AND FACTS

Hayward's convictions for first-degree murder, armed robbery, armed burglary of a conveyance, and possession of a firearm by a convicted felon, and his death sentence, were affirmed on direct appeal in Hayward v. State, 24 So. 3d 17 (Fla. 2009), cert. denied, 559 U.S. 1097 (2010). The facts of the case were set forth in this Court's direct appeal decision in detail. Hayward shot and robbed Daniel Destefano in St. Lucie County in the early morning hours of February 1, 2005. Trial was held in 2007. Destefano was a newspaper delivery person in Fort Pierce and was filling a newspaper stand at a convenience store around 4 a.m. when he was accosted by Hayward. A witness heard Destefano shouting "I don't have no more," and heard two gunshots followed by a louder gunshot. Id. at 24.

Hayward shot Destefano twice with a .22 caliber pistol and Destefano, who had a concealed weapons permit for his .357 caliber revolver, shot Hayward once in the hand. The witness saw a black man searching Destefano's car and then going under a street light where he appeared to examine his hand. The man was

wearing some sort of head covering.  Id.  The witness saw Destefano limp away in an easterly direction and saw the black male leave the area in a westerly direction by way of a short-cut around the witness's nearby rooming house.  Id.  Hayward's blood was later found at the crime scene on personal items around Destefano's car, on the outside wall of the witness's rooming house, and on a fence post near the witness's rooming house.  Id. at 26.  Not long after he was shot, Destefano was found about a block away.  When paramedics and police responded, an officer asked him, "What happened?" to which Destefano responded that a black male with a stocking cap over his face had shot him.  Soon thereafter Destefano died. Id. at 24.

Hayward's girlfriend testified that Hayward came to their rooming house near the convenience store just before dawn on the day of the shooting with an injury to his hand.  Two days after the shooting, police responded to the rooming house after receiving a report that someone there had a possible gunshot wound to his hand and had asked a resident to sew it up.  Id. at 24-25.  The police were allowed by other residents to enter and found Hayward coming out of a communal bathroom.  They asked to see his wound, which was wrapped, and he showed it to them, claiming it was a knife wound inflicted by his girlfriend.  Hayward consented to go outside and speak with officers.  Hayward was subsequently asked to come to the police station to discuss the injury to his hand, to which he agreed,

and was handcuffed for the ride in the back seat of the police car. The officer told Hayward he was not under arrest, and that it was "policy" to handcuff anyone being transported in the police car. Hayward suddenly stated that he "wasn't going to lie" and that he had been robbed and shot several days earlier. Hayward's girlfriend also informed the officers that she had stabbed Hayward in the hand, but that he had reported to her that he had been shot when two black men were robbing him. She said he was shot in the same hand where she had earlier stabbed him. Id. at 25.

Once at the police station, Hayward was uncuffed but secured by an ankle bracelet, and was advised of his Miranda rights.[1] During the interview, he told police he had not been stabbed in the hand, but had been shot in the robbery attempt by two men, one black and one Mexican, when he attempted to take their gun away. He later changed the story to say he was not robbed, but had witnessed Destefano being robbed and shot by a lone man, and that when he, Hayward, attempted to pick up a gun at the scene, he was accidentally shot. He also admitted going through Destefano's car looking for anything of value. Id. at 25. Several months later, the murder weapon, a .22 caliber revolver, was found behind a wall

---

1. Miranda v. Arizona, 384 U.S. 436 (1966).

board in the rooming house where Hayward's girlfriend lived. Hayward's blood was found inside the gun's firing chamber. Id. at 26.

At the penalty phase, the State presented evidence of Hayward's prior conviction for second-degree murder and armed robbery. Hayward presented mitigation through testimony from four family members and an expert. Id. at 27. The jury returned a verdict recommending death by a vote of eight to four, and the trial court followed the recommendation, finding two aggravators: (1) prior violent felony convictions (extremely great weight); and (2) murder during the course of a robbery merged with pecuniary gain (great weight).

No statutory mitigators were offered or found, but the trial court found the following nonstatutory mitigation: (1) Hayward could have received a life sentence; (2) he grew up without a father; (3) he was loved by his family; (4) he had academic problems; (5) he obtained a GED in prison; (6) he would make a good adjustment to prison; (7) he had financial stress at the time of the crime; and (8) he had some capacity for rehabilitation. Each mitigating factor was given "little weight" except for the factor that Hayward could have gotten a life sentence, which was given "very little weight," and the factor that he grew up without a father, which was given "some weight." Id.

On direct appeal, Hayward raised a number of claims of error pertaining to his conviction and his sentence, which were found to be without merit or harmless

beyond a reasonable doubt.[2]  We affirmed the convictions and sentence, finding

that Destefano's statements to the first responders describing his attacker qualified

as an excited utterance exception to the hearsay rule and not as a dying declaration.

Id. at 31.  However, we also concluded that the statements were a Confrontation

Clause violation under the authority of Crawford v. Washington, 541 U.S. 36

(2004), although we found the error to be harmless beyond a reasonable doubt.[3]

---

2.  On appeal, Hayward asserted that (1) the statements of the murder victim to police describing his attacker were improperly admitted under the excited utterance and dying declaration exceptions to the hearsay rule, and in violation of the Confrontation Clause; (2) introduction of Hayward's statements to police at the rooming house and their observations while there violated his Fourth Amendment rights; (3) introduction of the recorded jail conversations between Hayward and former girlfriend Dorothy Smith were more prejudicial than probative due to the vulgarity of the language used, affecting both the guilt and penalty phases; (4) comments made by the prosecutor in closing argument during the penalty phase comparing the life choices made by the victim and by Hayward constituted prosecutorial misconduct requiring resentencing; (5) there was insufficient evidence concerning the identity of the shooter; (6) there was insufficient evidence as to whether a robbery was actually accomplished; (7) there was insufficient evidence establishing premeditation; (8) the standard jury instruction on premeditation is insufficient; (9) Florida's sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002); and (10) imposition of a death sentence based on an eight-to-four jury recommendation is unconstitutional.  See Hayward, 24 So. 3d at 28.

3.  After this Court issued its opinion in Hayward, the United States Supreme Court decided Michigan v. Bryant, 562 U.S. 344 (2011), in which the Supreme Court held that it was not a Crawford confrontation clause violation to admit the out-of-court statements of a mortally wounded shooting victim identifying the shooter under circumstances very similar to those in this case because the primary purpose of the statements was to enable police to meet an ongoing emergency.  Id. at 349.

As to the police encounter with Hayward in the rooming house, we found that the encounter was consensual and that the police had probable cause to detain Hayward for questioning. As to the claim that Hayward was illegally detained when handcuffed as a matter of policy for the ride to the police station, we explained:

> The State concedes that handcuffs are restraining devices but contends that Hayward was not detained because the use of handcuffs during transport was a routine safety measure followed by the police. Although Hayward was in the process of being handcuffed pursuant to police policy at the time of his statement, the totality of the circumstances, including the purpose of the officer's conduct and the spontaneous nature of Hayward's statement, demonstrate that his statement was not the result of any alleged illegal detention.

Hayward, 24 So. 3d at 36. This Court found that once at the police station, Hayward was detained, but gave his statements voluntarily after waiving his Miranda rights. Id. at 36-37.

As to Hayward's claim of fundamental error in prosecutorial comments comparing his life choices with those made by the victim, we found that the argument was error but not fundamental. Id. at 42. Hayward's other claims on direct appeal were found to be without merit.

## Postconviction Proceedings

On April 21, 2011, Hayward filed his initial motion for postconviction relief, which he subsequently amended on August 16, 2011.[4] After a case management

_____

4. In his rule 3.851 amended motion, Hayward raised the following claims: (1) application of Florida Rule of Criminal Procedure 3.851 to Hayward's case was improper because it limits the time for filing postconviction proceedings as to death-sentenced individuals and treats them differently than all other persons seeking postconviction relief, prejudicing Hayward because it provided insufficient time to obtain all necessary records and prepare for an evidentiary hearing; (2) Hayward's constitutional rights are being violated by being denied access to public records because section 119.19, Florida Statutes, and Florida Rule of Criminal Procedure 3.852 limit the production of public records in capital postconviction cases, thus violating article I, section 24, of the Florida Constitution; (3) rules prohibiting Hayward's counsel from interviewing jurors to determine if constitutional error is present deny Hayward his constitutional rights; (4) trial counsel was ineffective during the guilt phase of trial due to professional, personal, and emotional problems during the trial requiring him to be medicated with psychotropic drugs, and co-counsel was suspended from the practice of law for 90 days while preparing for Hayward's trial, thus providing a conflict of interest—resulting in ineffective assistance in the motion to suppress hearing concerning incriminating pre- and post-Miranda statements to police, failure to challenge scientific evidence in the guilt phase, failure to effectively challenge the State's witness Roosevelt McDowell, and failure to effectively argue for exclusion of hearsay statements; (5) trial counsel was ineffective in (a) failing to investigate and present mitigation evidence, including mental health mitigation, (b) failing to provide sufficient time for the expert to examine Hayward, and failing to discover and present mitigation concerning Hayward's childhood, and the fact that he was impoverished, abused, suffered impaired cognitive functioning, low intelligence, brain damage, and a history of alcohol and drug abuse, (c) failing to discover and prepare family members, teachers, or social workers, and obtain school records for mitigation, (d) failing to object to prosecutorial misconduct in closing argument which the Florida Supreme Court found improper on direct appeal but not fundamental; and (6) Florida's lethal injection statute and existing procedures are unconstitutional.

hearing held on December 19, 2011, the trial court ordered an evidentiary hearing on certain of the claims. The evidentiary hearing was held on February 27, 2012, through March 1, 2012, and March 28, 2012. At the hearing, Hayward presented the testimony of trial counsel Robert Udell and Jerome Stone, Jr.; family members Barbara Johnson (mother), Debra Fleury (sister), Derrick Green (brother), and Terrance Hayward (brother); Pamela Clark (mother of his child); forensic and clinical psychologist Dr. Michael Riordan; trial defense investigator Venus Oleyourryk; social worker Cecelia Alfonso; and behavioral neurologist Dr. Thomas Hyde. The State presented Fort Pierce Police Captain Greg Kirk, State Attorney Investigator Ed Arens, Jr., and Dr. Michael Riordan. The circuit court entered its order denying postconviction relief on June 14, 2012, and this appeal followed.

After Hayward filed his notice of appeal from denial of postconviction relief, he filed a petition for writ of habeas corpus in this Court on September 17, 2013, raising one claim. He contends in his petition that his appellate counsel was ineffective for failing to raise as fundamental error a claim that State's witness Roosevelt McDowell was incompetent to testify and should have been disqualified as a witness. Hayward contends that McDowell was "old and sick" and could not recall even the most basic details of the event he witnessed, and that admission of this testimony was fundamental error without which the jury would not have had a

- 9 -

basis to find that the murder occurred in the course of a robbery and was committed for pecuniary gain; and that the jury would not have recommended a sentence of death. We turn first to the issues raised in Hayward's appeal from denial of postconviction relief.

## II. ANALYSIS

### A. Claim of Ineffective Assistance of Counsel in the Penalty Phase

Hayward contends that both of his trial counsel were deficient in investigating and presenting mental health mitigation and family background mitigation in the penalty phase of his trial. Hayward further claims that this deficient performance prejudiced him and that, had the information been developed for the jury and the judge, he probably would have received a life sentence.

To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's representation fell below an objective standard of reasonableness and, but for counsel's deficiency, there is a reasonable probability that the result of the proceeding would have been different—a reasonable probability being one sufficient to undermine confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 694 (1984). Where the defendant claims counsel rendered ineffective assistance in the penalty phase, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death." Id. at 695; see also Foster v. State, 132 So. 3d 40, 52 (Fla. 2013). "To assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence . . .' and 'reweigh[s] it against the evidence in aggravation.' " Porter v. McCollum, 558 U.S. 30, 41 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000)).

However, Strickland cautions that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

The Supreme Court also recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id. at 691. Because both deficient performance and prejudice must be shown, a reviewing court is not required to issue a ruling on one prong of the test when it is apparent that the other element is not satisfied. See id. at 697; Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986). With this

standard in mind, we turn to the question of whether Hayward demonstrated that trial counsel was deficient in investigation and presentation of mental health and background mitigation at trial.

Hayward was represented at trial by Robert Udell and Jerome Stone, who were assisted for a short time by an investigator named Venus Oleyourryk. The defense theory developed by the team was that Hayward came from a reasonably good background with productive relatives and would do well if given life in prison. Stone testified that defense counsel decided not to present testimony from any of Hayward's siblings who were in prison or had criminal records because presenting testimony of relatives who had been incarcerated or had a criminal history would only emphasize the fact that Hayward had been in prison. At the penalty phase of trial, counsel presented testimony of Hayward's sister Debra, who was a Sheriff's deputy, his mother, and his brother Terrance, who had been in the military. Trial counsel also reviewed school records and obtained a life history of Hayward. Stone did not recall Hayward reporting any abuse by family members when he was growing up.

Robert Udell, lead counsel in Hayward's trial, testified that in preparation for the penalty phase, he reviewed Hayward's medical records, school records, criminal history, Florida Department of Corrections records, and some social history records. He spoke with Hayward's family members in a group setting and

spoke with Hayward's mother and sister numerous times by telephone. He recalled that the family members told him the family was somewhat dysfunctional and poor, but loving. Udell learned that Hayward's father suffered from alcohol abuse and was sometimes violent in disciplining Hayward, but that Hayward was a loved family member.

Venus Oleyourryk, a registered nurse who also acted as an investigator in court cases, including Hayward's beginning in June 2005, testified at the evidentiary hearing that she assisted Udell with Hayward's case and also assisted Udell in a California criminal case he litigated from 2006 to January 2007. In Hayward's case, Oleyourryk spent 100 hours between June 2005 and May 2006 meeting with Hayward, copying discovery, and going through documents. She spoke to Hayward's mother and sister early in the case. She did not perform any work on Hayward's case after May 2006, and spent most of her time on the California case, which concluded with a verdict against Udell's client in January of 2007, two months before Hayward's trial. She testified that after Udell's client in the California case was convicted, Udell appeared to be "in a haze."

During trial preparation, Udell also retained Dr. Michael Riordan shortly before Hayward's trial. Dr. Riordan evaluated Hayward and informed Udell that Hayward exhibited some traits of antisocial personality disorder and suggested that additional testing could be done, but indicated it might not be fruitful in terms of

mitigation. Udell testified at the evidentiary hearing that he did not want further testing to confirm antisocial personality disorder, which sounded more like aggravation than mitigation. Dr. Riordan told Udell that if the testing revealed a personality disorder "not otherwise specified," rather than antisocial personality disorder, such result might be mitigating; although if the testing confirmed antisocial personality disorder, that might be considered aggravating. Dr. Riordan explained that the basis for concluding there were characteristics of antisocial personality disorder was Hayward's history of criminal activity.

Although he was hired only shortly before trial, Dr. Riordan had sufficient time to prepare and did testify during the penalty phase of trial. He examined Hayward for mitigating evidence and took a psychological history, noting that Hayward appeared to be a "reliable historian." He reviewed Hayward's school records, social history records, and Department of Corrections records. Dr. Riordan testified during the penalty phase that Hayward's biological father was often intoxicated and offered Hayward alcohol when he was five years old. Dr. Riordan told the jury about Hayward not receiving guidance from his father and having to rely on older siblings because his mother was often absent. The jury heard that Hayward had a substance abuse problem and alcohol problem in his teen years and that Hayward functioned below his intellectual ability in school, necessitating placement in special education for a period of time. The jury also

heard from Dr. Riordan that Hayward had suicidal thoughts while in prison, but there was no indication of psychosis. Dr. Riordan told the jury about how well Hayward worked in prison and how he received outstanding ratings for his work there.

The subject of Hayward suffering physical abuse from his siblings did not come up during Dr. Riordan's trial testimony, although Hayward's older sister Theresa testified in the penalty phase that she and her siblings often beat Hayward as a form of discipline. Dr. Riordan testified at the evidentiary hearing that he was aware the children in the family lived in a state of neglect but opined that because they did not think of it as neglect at the time, it might not have been reported as neglect. He agreed that the belief by the children that their upbringing was normal could account for why Hayward and his siblings did not report any abuse or neglect.

Hayward's older sister, Debra Fleury, a Fort Pierce Sheriff's Deputy, testified at the penalty phase that their mother worked two jobs and provided the children a good clean home with food and clothing to the best of her ability. Fleury confirmed that her older sister Theresa would give Hayward a "whooping" as discipline. She said Hayward was a good brother but started getting into trouble around age 13 or 14 while she was in the military. She said Hayward was hard-headed and angry, especially when a baby cousin came to live with them.

At a <u>Spencer</u>[5] hearing prior to sentencing, Fleury testified that she wanted the court to know that the siblings did not testify about "everything" in the penalty phase. She explained to the court, "They're embarrassed. But the Court needs to know that my family was not the Huxtables and weren't the Cleavers. We were totally different. We were I would say dysfunctional." She testified that some of her brothers were now in prison and had drug problems, her sister is a recovering drug addict, and one brother did well in the military but came back with a drug abuse problem. She also testified at the <u>Spencer</u> hearing that her older brothers and sister were rough on Hayward as a child, and that Hayward's biological father had anger problems and was an alcoholic, "but he didn't give us any problems."

At the postconviction evidentiary hearing, Fleury testified that her sister Theresa was responsible for caring for her siblings, starting when Fleury was only five years old and Hayward was a baby. Theresa was characterized as "bossy and mean," and Fleury testified Theresa would hit the children. When Hayward's stepfather Harold came home on weekends, the children would get "a whippin'." Fleury said he beat them with tree branches, belts, extension cords, or a water hose on their arms, legs, backs—anywhere he could reach. They had to "hug the wall"

---

5. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993) (providing for a hearing after trial at which the parties may present to the sentencing judge any additional information or evidence pertinent to the appropriate sentence to be imposed and to afford the defendant an opportunity to be heard in person).

during the beatings and if they ran, the other children had to bring them back and hold them for the beating. Fleury testified that her mother beat the children too if she was drinking alcohol, and her beatings were more methodical and took longer. She also used switches, extension cords, or a water hose, and would wake them up in the middle of the night to beat them if the kitchen was not cleaned up. Hayward was not deterred by the beatings and would get beaten more and started running away at age 12 or 13.

Fleury testified at the evidentiary hearing that their mother and some of the children, including Hayward and infant cousin Sam Peaks, moved to Vero Beach when Fleury was around nine years old to get away from Hayward's stepfather Harold. Tony Johnson, Hayward's biological father who was a fruit contractor, lived with them in Vero Beach, and her mother and the children often worked in the orange groves. When Johnson was drunk, he was verbally abusive. He and their mother fought physically and their mother would sometimes call the police. Fleury testified she was aware that Hayward's siblings beat him because she saw them doing it. Approximately twice a week, they would "body slam" him in the yard, throw him against the walls and furniture, and might have hit him with their fists.

Fleury testified that she met once with trial counsel Udell several weeks before the trial and then a couple of times during the trial. She never met with any

of trial counsel Udell's experts. She said Udell never asked about any beatings when the children were growing up and never asked about Tony Johnson's behavior or the violent relationship with Harold Hayward, nor did he ask about her mother's alcohol use.

Fleury agreed during the evidentiary hearing cross-examination that she told the judge at the Spencer hearing that the family was embarrassed to say what occurred in Hayward's childhood. She also agreed that her testimony at the evidentiary hearing about Theresa's treatment of the children differed only "in the details" from what she testified to at trial. She denied holding back information and denied misleading the court at the trial and Spencer hearing, and said that any discrepancies in her testimony were not intentional.

Hayward's brother Terrance Hayward testified during the penalty phase at trial and was called to testify at the evidentiary hearing. At trial, Terrance testified that he previously served in the Army and was working in construction. He said Hayward's biological father, who lived with them for a time, was an alcoholic, and that Hayward and his brothers were close and cared about each other.

At the postconviction evidentiary hearing, Terrance testified that when he and his brother were growing up, his father was away most of the time and their mother worked two jobs, so the children raised themselves. When his father Harold came home, his mother would report who had disobeyed that week and his

father would give them a "whoopin'." He reiterated that the children were hit with hoses, extension cords, tree branch switches, and other things on their arms, legs, and backs, which resulted in welts, bruises, and torn skin. He said Hayward was given the same treatment. His mother would also give the children whippings.

He testified that the children often went hungry because there was no food in the house. Terrance would obtain food with expired dates, which a friend got to feed his hogs, and bring it home to the family to eat. Terrance testified that Hayward's biological father Tony Johnson lived with them in Vero Beach. He and Hayward's mother would argue and fight when the children, including Hayward, were in the house and the fights resulted in several stabbings. Terrance said the whole family would work in the orange groves on weekends and after school, and sometimes as punishment. Terrance and his brothers would beat Hayward in what they called "initiation" to toughen him up. The toughening up happened two or three times a week and consisted of different wrestling moves. When it was done on Hayward, he was about eight years old, and they would "body slam" him, punch him, and perform other wrestling moves on him that they saw on television.

Terrance testified that he attended the group meeting with trial counsel Udell prior to trial and met once again in the courtroom during trial. Udell did not ask about any beatings, fights between his mother and Tony Johnson or Harold Hayward, eating expired food, or his father's or mother's alcohol consumption.

Udell asked Terrance about himself, but not why he was discharged from the military, which was for drug addiction. Terrance confirmed that his brothers Leon and Derrick, and his cousin Samuel Peaks, had all been in prison.

Hayward's mother, Barbara Johnson, who also testified at the penalty phase of trial, testified at the evidentiary hearing about her two marriages and the children she raised—six of her own, plus Peaks, and several grandchildren. Postconviction counsel was not allowed to present testimony about Barbara Johnson's childhood with a family in South Carolina. The testimony was proffered that Barbara's mother placed her and her brother with "foster parents" Daisy and Lawrence Green.[6]

---

6. Barbara testified on proffer that life was not good with the Greens because she was beaten regularly with switches and rope. Barbara said that Daisy Green tied her to a tree for eating some of the family's food without permission, and once strung her up in a tree naked and beat her. Daisy also kicked her in the head, leaving a scar. Barbara said she did not know that this was not normal treatment. Daisy made her quit school in eighth grade and work in the cotton and tobacco fields. When Barbara was about seventeen years of age, she was sent to New York to work and send money back to Daisy. Barbara got pregnant there by a man named Nathaniel and returned to the Greens where she had a baby she named Derrick. When Derrick was a toddler, Barbara was made to marry Harold Hayward and they moved away. Derrick was left with the Greens but she retrieved him from the Greens when he was about eleven years old. The proffer was ended and the evidence was excluded.

Johnson related moving to Florida and having five more children in somewhat quick succession. She started working after Hayward, her youngest, was born. Because her husband, Harold, worked in construction and only came home on weekends, her seven-year-old daughter Theresa was in charge of taking care of toddler Hayward. The older boys had no caretaker most of the time. When her infant nephew Samuel Peaks came to live with them when Hayward was about five, Theresa had to take care of him too.

Barbara testified at the evidentiary hearing that when Harold came home on weekends, she would report what the children had done during the week and "[h]e would whip 'em with a switch off a tree." Barbara said she also beat the children with a switch when they were little because that was what was used on her as a child. She and Harold got drunk when he was home on weekends and, when drinking, they fought in front of the children. She said she, Harold, and the children would work in the orange groves on the weekend to make money to buy alcohol.

Barbara and Harold fought a lot and separated several times, but the last time occurred when she came home and found that Harold had hit daughter Theresa with a rubber automotive belt and injured her leg. Tony Johnson, Hayward's biological father, helped her and some of the children relocate to Vero Beach and moved in with them. Barbara and Tony, who was an alcoholic, fought

almost every night, and Tony would sometimes brandish a knife or a gun, so she often called the police. At one point, she cut him with a knife. Barbara testified that Hayward was in trouble a lot while in school and had difficulty with school work, but she could not help him because she did not have much education and could not afford to obtain help for him.

She testified at the evidentiary hearing that she learned from a neighbor that Hayward's brothers were "not treating" him right. The State objected that this was hearsay, so her testimony was proffered that when Hayward was a child, a neighbor, now-deceased Lucy Collins, told her that the older brothers "fought" Hayward when he was about age eleven. The court excluded the testimony, finding the hearsay "blatantly unreliable," and because of the inability of the State to rebut it.[7]

In preparation for trial, Barbara met once with trial counsel Udell in his office for several hours, along with other family members, and she had several telephone conversations with Udell. Udell did not ask about Hayward's childhood or her own childhood, whether Hayward was beaten, or about her fights with

_____

7. Barbara Johnson testified to this same information at the Spencer hearing after the penalty phase of trial. Also, during the penalty phase of trial, Hayward's mother testified that due to the family's financial difficulties, she had to work two jobs and was frequently absent from the home, and that Hayward's stepfather was present in the home during his early years and that he loved Hayward.

Harold Hayward or Tony Johnson.  He did ask about Tony's alcohol consumption and they discussed Terrance's drug abuse.  She only met co-counsel Stone in court.

Derrick Green, Hayward's brother, testified at the evidentiary hearing that he was currently incarcerated for armed robbery and other charges.  At about age eleven, he was retrieved from the Greens in South Carolina by his mother, Barbara Johnson, and brought to live in Florida with her and Harold Hayward.  Derrick was not allowed to testify about the abuse he suffered in South Carolina at the hands of Daisy and Lawrence Green, so that testimony was proffered.[8]  He was taken to Florida by his mother and lived in the household with his other half-brothers and sisters where he also received beatings when Harold Hayward came home.  He was struck with switches, a water hose, a washing machine belt, and a piece of car tire.  He said Harold appeared to enjoy beating the children.  The boys, and especially Hayward, would get beaten more than the girls.  Derrick also testified that their mother would sometimes give beer to the children, including Hayward.  His

---

8. On proffer, Derrick testified that when living with the Greens, he received beatings with a switch or other object about every other day from age five to age eleven when his mother came to get him.  Lawrence Green sometimes whipped him with a leather horse whip.  He testified that once Daisy Green hit him in the eye during a beating and he was blind for several weeks.  He was made to pick cotton, tobacco, and vegetables from about age five.  When he was about eleven years old, his mother, along with Harold Hayward and Tony Johnson, came to get him and took him away after his cousin called them to report the abuse he was receiving from the Greens.

mother separated from Harold after he got angry at Derrick and retrieved his gun, although she left Derrick and Leon at the house with Harold when she and the other children moved to Vero Beach.

Derrick testified about Tony Johnson coming to live with them in Vero Beach. His mother admitted to him that Tony was Hayward's biological father, although Hayward only learned of this when he was older. Derrick said his mother beat Hayward starting when Hayward was four or five years old, but Tony Johnson never hit the children. Derrick and the other family members worked in the groves with Tony on weekends or when school was out. Derrick testified that he and his brothers abused Hayward from the time he was about seven, thinking they were toughening him up, and when he cried they just did it more. They used Hayward as their "guinea pig" to practice the wrestling moves they saw on television. Derrick left home at age seventeen and, when Hayward went to trial for this murder, Derrick was in prison in Georgia and no one from the defense team contacted him.

On cross-examination, Derrick denied telling the State Attorney investigator Ed Arens prior to this hearing that his mother did not beat the children and denied telling the investigator that there was nothing to report concerning abuse of Hayward during his childhood. Derrick said he did not view the wrestling that the brothers did with Hayward as abuse at the time, but looking back on it now, he

thinks it was abuse. By way of impeachment of Derrick, the State presented the testimony of investigator Ed Arens that he interviewed Derrick Green in prison on February 7, 2012, about one month before the evidentiary hearing and asked Derrick if their mother had ever been abusive to the children. Arens testified Derrick did not tell him that his mother did any disciplining and did not mention the brothers or sister being abusive to Hayward, even though the question was asked if anyone had been abusive to Hayward when he was growing up. Derrick told him only his father and stepfather were abusive toward the children.

In addition to family members, postconviction counsel presented Pamela Clark, the mother of Hayward's son, who said she could have testified at trial about Hayward being a loving father.

Cecilia Alfonso, a forensic social worker and mitigation specialist in death penalty cases, testified at the evidentiary hearing. Alfonso performed a "biopsychosocial assessment" of him after meeting with him for three and one-half hours. She also reviewed school, medical, and prison records, as well as trial transcripts. Based on school records, she concluded Hayward had a learning disability, poor school attendance, repeated several grades, and dropped out at age sixteen. She testified that his standardized testing scores were low. She concluded from the Department of Corrections' records that he had suicidal thoughts at one time, and had some unresolved health problems.

- 25 -

She interviewed family members and Hayward's former girlfriend Dorothy Smith. Alfonso was not allowed to testify about Hayward's mother's childhood or the childhood experiences of Hayward's brother Derrick before Hayward was born.[9] Alfonso was allowed to testify that Derrick reported to her that when living with Barbara Johnson and Harold Hayward, Harold would repeatedly beat the children with a switch, a belt, or a cord.

The court also excluded Alfonso's proffered testimony that in her interview with Hayward's sister, Theresa Williams, Alfonso was told that Theresa and her brothers were abused and that the mother was absent most of the time.[10]

---

9. The testimony was proffered about Hayward's mother's life with the Greens in South Carolina. A further proffer was made that the mother's childhood experiences were relevant mitigation for Hayward because it showed that she raised her children in an abusive manner just like her foster parents raised her, and as a consequence, that type of violence was internalized by Hayward, and his ability to develop a sound decision-making process was adversely affected. Alfonso was also not allowed to testify about the childhood of Hayward's older brother Derrick when he lived with the Greens.

10. Alfonso's testimony was proffered that Theresa told Alfonso that she hit and pinched Hayward; that the mother drank alcohol on a daily basis and would drink alcohol and fight with Harold Hayward on weekends; and that Harold would beat the children. Theresa reported that Tony Johnson was also a drunk and would threaten the children when he was home. Alfonso said this information supported the conclusion that violence was normalized in Hayward's mind as he was growing up; and that in acting in a surrogate mother position, Theresa also violated the responsibility of nurturing and protecting Hayward.

The court also excluded as inadmissible hearsay Alfonso's testimony of what she learned from Samuel Leon Hayward, one of Hayward's older brothers. Alfonso testified on proffer that Leon said Harold would beat them when he came home on weekends and that one time after a drunken fight with the mother, Harold

Hayward's mother reported to Alfonso that after she separated from Harold, Tony Johnson moved in and was a very heavy drinker. He did not beat the children, so the mother took over that responsibility of discipline and would hit them with a switch or a belt on their back and arms. Alfonso testified that her interview with Hayward's brother Terrance confirmed that Hayward was raised in a "battle zone" and was subjected to repeated abuse, which taught Hayward that violence is acceptable.

Alfonso concluded that the violence Hayward suffered and was exposed to as a child deprived him of learning about nonviolent ways to live. She opined that his low-normal IQ indicates that he had the ability, but was not provided with the cognitive tools, to develop strategies for coping. She said his environment deprived him of a sense of competence in the area of academics, but taught him to value competence in fighting and being able to tolerate physical and emotional

_____

realized she had shot him in the foot. Leon would punch, beat, and jump on Hayward to take out his own frustrations. Alfonso explained that this was significant as mitigation because it contributed to the extent, nature, and duration of the abuse Hayward suffered. Also on proffer, Alfonso testified to her conversation with Hayward's former girlfriend, Dorothy Smith, who said that she grew up in the same neighborhood as Hayward's family and they were all "crazy, dirty, and bizarre." Alfonso said this was an indication of mental illness in the family. Alfonso said Smith told her that while she was in the relationship with Hayward, he acted strangely and had suicidal thoughts. The judge excluded Alfonso's opinion that Hayward's mother failed in her role to nurture and protect Hayward. The circuit court held that it was not relevant to what mitigation was available for presentation to the penalty phase jury.

abuse. She said the mitigation she developed was different than that presented in the penalty phase of trial because there was no presentation of the nature, extent, and duration of the abuse that occurred and, although witnesses said it was a dysfunctional family, the details were not provided to the jury.

Hayward presented the testimony of Dr. Thomas Hyde, a behavioral neurologist, at the evidentiary hearing. Dr. Hyde was given background materials and records, and met with Hayward to evaluate his neuropsychiatric history, to perform an examination, and reach some general conclusions about his neuropsychiatric status. Dr. Hyde testified that he performed a "Mini Mental State Examination," sometimes known as the Folstein Mental State Exam, a behavioral neurological examination, as well as cranial nerve, motor, gate, and sensory examinations and a limited general physical examination.

Dr. Hyde concluded that Hayward had poor complex motor sequencing in both hands, which he said is often indicative of frontal lobe dysfunction. Dr. Hyde also concluded that Hayward had subtle abnormalities that were significant— increased deep tendon reflexes at the left biceps, triceps, brachioradialis, knee and ankle, and crossed adductors on the left, all suggesting right frontal lobe dysfunction. Dr. Hyde concluded that Hayward suffered from right frontal lobe dysfunction which adversely affects his prioritization, reason, judgment, problem solving, attention span, focus, and manipulation of information. He explained that

frontal lobe dysfunction can also cause impulsivity, inability to maintain long-term relationships, employment difficulty, and substance abuse; and can make the individual susceptible to mood disorders, such as depression and manic depressive illness. Dr. Hyde did not ask for an MRI, PET, or any other brain scan testing to be done.

Dr. Hyde opined that Hayward's poor school performance despite a 91 IQ indicated either a learning disability or some type of developmental neurological dysfunction affecting his performance. He opined that school records and Hayward's performance on the testing done by Dr. Hyde indicated Hayward suffered from attention deficit disorder. He said Hayward had elements in his history consistent with depression NOS (not otherwise specified) dating back to childhood but did not meet DSM-IV R criteria for major recurrent depressions. Overall, Dr. Hyde found that Hayward had circumscribed areas of cognitive deficits that were not pervasive but can be significant. Dr. Hyde testified that he asked Hayward if he suffered any abuse by anyone when he was a child and was advised there was no abuse history.

In rebuttal, the State recalled Dr. Michael Riordan, who testified that there are a number of tests that a forensic neuropsychologist can administer to assess and diagnose brain damage in the various lobes of the brain. The Expanded Halstead-Reitan Battery is one of those tests, comprising twenty-one separate elements.

Dr. Riordan examined the testing done by Dr. Hyde and the RBANS test (Repeatable Battery for the Assessment of Neuropsychological Status Update) administered by a Dr. Harvey, who did not testify. Based on this review, Dr. Riordan did not find any indication of frontal lobe damage. Dr. Riordan did not believe the "Mini Mental State Exam" performed by Dr. Hyde was the proper test to use to determine if there was frontal lobe impairment. He further concluded that Hayward's score on the test was normal and did not indicate any problem. Dr. Riordan said Dr. Hyde's examination did not go far enough and, to the extent any of his findings suggested frontal lobe damage, further neuropsychological testing should have been done.

**The Postconviction Order Denying Relief**

On this issue, the circuit court denied relief, concluding that Hayward presented no records that trial counsel had failed to provide to Dr. Riordan at trial, and Hayward failed to show that Dr. Riordan had insufficient time to review the records or perform a thorough mental health examination. The court concluded that Dr. Riordan found no reason to conduct neuropsychological testing, but recognized traits of antisocial personality disorder that would not be mitigating. The court also found that Dr. Hyde relied on the same records as Dr. Riordan and did not administer any psychological tests. The court held that the fact that Dr. Hyde arrived at a different conclusion than Dr. Riordan did not prove the initial

evaluation by Dr. Riordan was inadequate. The court noted that Dr. Hyde found no history of head injuries and that, although he found soft signs of frontal lobe dysfunction, depression NOS, and childhood ADHD, Dr. Hyde could not describe the degree of neurological impairment or link these diagnoses to Hayward's adult functioning and behavior. The court also noted that Dr. Riordan reviewed the results of Dr. Hyde's examination and found no evidence of frontal lobe impairment.

As to the claim that trial counsel was ineffective in discovering and presenting evidence of childhood abuse and neglect and in failing to properly prepare lay witnesses to testify in the penalty phase, the circuit court also denied relief. The court concluded that evidence that Hayward was punished from the time he was a young child by whippings or beatings with a hand, belt, switch, extension cord, water hose, or piece of tire and suffered welts and sores from that punishment was simply amplification and evolution of the nature, duration, and extent of the corporal punishment testified to at trial. The family members also admitted that they believed this punishment was a proper form of discipline and that "it was the way it was supposed to be," although their opinions had now changed.

The court noted the evidence that Hayward lacked adult supervision and bonding as a child, his parents fought violently, and his brothers beat him and

wrestled violently with him to "toughen him up." The court found that his father was an alcoholic, and Hayward did not do well in school, but that much of this evidence was presented at trial and was simply being amplified in detail. The court also concluded that this evidence was undercut by the fact that the postconviction motion alleged the family members were embarrassed to testify to all this information at trial, by the fact that Hayward failed to report any abuse to his trial counsel or mental health expert, and by the inconsistent testimony of family members about abuse and neglect.

The court rejected the testimony of mitigation specialist Cecilia Alfonso, who presented testimony about how the circumstances of Hayward's childhood had an ongoing adverse impact on his ability to make good judgments and conform to the law as an adult. The court found that her testimony was not credible because at the evidentiary hearing she testified to details of abuse that she failed to reveal in her deposition and refused to admit that she was an advocate for the defendant, but later recanted that position. Finally, the circuit court held that despite the fact that there was additional evidence of mitigation which was not presented at trial, the court would assign little weight to those circumstances, and concluded that no prejudice was shown as to the outcome of the penalty phase. The circuit court stated that "the mitigating circumstances added to the totality of the mitigating circumstances found at trial are outweighed by each statutory aggravator."

## Discussion

The circuit court was correct that much of the information that was provided by evidentiary hearing testimony was also presented at the penalty phase. The penalty phase jury heard testimony that Hayward's parents were mostly absent, his father was an alcoholic, Hayward did not do well in school, and Hayward's older sister would give him a "whooping" as discipline. The trial judge also heard in the Spencer hearing that Hayward's brothers would violently wrestle him on a regular basis. The jury was told by Theresa Williams, Hayward's sister, that she and her siblings would "beat him a lot" for discipline. By way of mental mitigation, the jury was told that Hayward had no bond with his father, that he developed a substance abuse problem, that he was the product of a dysfunctional family, that he had academic problems in school and was placed in special education, and had suicidal thoughts while incarcerated.

Trial counsel Udell and Stone testified at the evidentiary hearing that the trial strategy was to present Hayward as the product of a successful family with a hardworking mother who did her best to provide for her six children. Udell believed evidence that Hayward had traits of antisocial personality disorder would be aggravating rather than mitigating, and that testimony from family members who were incarcerated or convicted felons would not have served to paint Hayward in the best light. Dr. Riordan testified at trial that Hayward would be a

good candidate for a life sentence because he had been successful in prison before, had received commendations, helped other inmates, supported his child, and could adapt to life in prison without causing problems.

We have long recognized that trial counsel's "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). The Supreme Court in Wiggins v. Smith, 539 U.S. 510 (2003), stated that

> Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

Id. at 527 (citing Strickland, 466 U.S. at 691). In assessing the reasonableness of an attorney's investigation "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527. Hayward never reported any childhood beatings to his counsel. Stone testified that he was never told of any childhood abuse even though he met with Hayward several times to talk about his background "from start to finish." Stone said he also reviewed school records and psychological testing records, which were also provided to Dr. Riordan. Although counsel knew prior to the penalty phase that

Hayward was essentially raised by his siblings, no one ever told counsel that the discipline or play the siblings engaged in with Hayward rose to the level of abuse.

This Court has made clear that "an attorney's obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated because this is an integral part of a capital case." State v. Pearce, 994 So. 2d 1094, 1102 (Fla. 2008). We also explained in Willacy v. State, 967 So. 2d 131 (Fla. 2007), that "[u]nder Strickland, 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " Id. at 143 (quoting Marshall v. State, 854 So. 2d 1235, 1247 (Fla. 2003) (quoting Strickland, 466 U.S. at 691)). However,

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690-91). Therefore, strategic decisions must follow a reasonable and thorough investigation. In light of the records that trial counsel reviewed, and in light of what both trial counsel were told—and not told—by family members and Hayward himself about his childhood, and in light of the possibility that further psychological testing could have indicated antisocial personality disorder, we find that counsel made a reasonable

investigation before deciding to present a strategy of "humanizing" Hayward and showing him in the best light possible.

In Rutherford v. State, 727 So. 2d 216 (Fla. 1998), we held that defense counsel properly relied on a strategy of "humanization" of the defendant rather than exposing his alcoholism and anxiety disorder. Id. at 223. In so holding, we drew a clear distinction between counsel's actions in Rutherford and those in cases where counsel made a decision to forego mental mitigation without making any meaningful investigation, such as in Rose v. State, 675 So. 2d 567 (Fla. 1996), where we reversed because trial counsel's mitigation decisions were "neither informed nor strategic" and 'there was no investigation of options or meaningful choice.' " Rutherford, 727 So. 2d at 223 (quoting Rose, 675 So. 2d at 572-73). Similarly, this Court granted a new penalty phase in Hurst v. State, 18 So. 3d 975 (Fla. 2009), where counsel was presented with information that Hurst had a low IQ, had borderline intellectual function, and counsel had information that Hurst's mother drank heavily when pregnant with him, suggesting the possibility of Fetal Alcohol Syndrome and brain damage. Id. at 1011. This Court concluded that counsel did not make an informed decision to ignore such mitigation and instead presented only insubstantial mitigation. In the present case, Stone testified that he did review school records and records of past psychological testing, which records

were also given to Dr. Riordan to review; and counsel did meet with family members and relied on information provided by them and by Hayward.

In Jones v. State, 998 So. 2d 573, 583 (Fla. 2008), we explained that where available information indicates that the defendant could have mental health problems, a mental evaluation is fundamental in defending against the death penalty. In this case, available information did not indicate Hayward had any mental health problems requiring additional investigation. The frontal lobe deficits to which Dr. Hyde testified were based on his interpretation of several tests administered to Hayward, but Dr. Riordan disputed that the results of those tests indicated any frontal lobe damage. Trial counsel's performance "is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert." Asay v. State, 769 So. 2d 974, 986 (2000). Nor does the presentation of additional mitigating evidence in the postconviction proceeding necessarily establish ineffective assistance of counsel. Hodges v. State, 885 So. 2d 338, 347 (Fla. 2004). "The pertinent inquiry remains whether counsel's efforts fell outside the 'broad range of reasonably competent performance under prevailing professional standards.' " Id. We find, based on the evidence presented at the evidentiary hearing, and evidence that was presented to the jury in the penalty phase, that trial counsel were not deficient in investigating and presenting

mental mitigation or mitigation based on Hayward's childhood and family background.

Moreover, prejudice has not been established. Even if all the mitigation presented at the evidentiary hearing were presented to a penalty phase jury, there is no "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; see also Foster, 132 So. 3d at 52. To assess that probability, the Court considers " 'the totality of the available mitigation evidence . . .' and 'reweigh[s] it against the evidence in aggravation.' " Porter v. McCollum, 558 U.S. at 41 (quoting Williams, 529 U.S. at 397-98). The totality of the mitigation in this case indicates that Hayward had a difficult childhood, suffered severe discipline by his parents and sister, and violent roughhousing by his brothers. The postconviction court was correct that the penalty phase jury, and the court in the Spencer hearing, heard much of the childhood mitigating evidence that was presented at the evidentiary hearing. Dr. Hyde's testimony of possible frontal lobe damage was subject to impeachment by Dr. Riordan's testimony and by the fact that Dr. Hyde did not refer Hayward for in-depth psychological testing. The aggravation in this case was heavily weighted, especially by the fact that one of the prior violent felonies was a murder. Thus, we conclude that even if Hayward had carried his burden to show that trial counsel's

decisions were not reasonable, strategic ones, prejudice has not been shown. Accordingly, relief is denied on this claim.

**B. Claim of Ineffective Assistance of Counsel at the Suppression Hearing**

Hayward next contends that trial counsel was deficient in failing to obtain a copy of the written policy of the Fort Pierce Police Department for transporting persons in patrol cars, and if he had done so, he would have found that the written policy only applied to prisoners, not to mere passengers. Hayward contends that had counsel obtained the written policy on prisoner transport, he could have effectively impeached Officer Darren Mace, an officer with the Fort Pierce Police Department who testified at trial that there was a written policy governing handcuffing of non-prisoners in patrol cars. Hayward further contends that if counsel had secured a copy of the actual policy, he would have been able to obtain a favorable ruling suppressing Hayward's first statement and those that followed. Hayward characterizes as "a lie" the testimony of Officer Mace that the policy calling for handcuffing anyone transported in a patrol car was a written policy. Hayward contends that the State failed to correct this false testimony, a violation under <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and failed to supply trial counsel with the written policy at trial in order for defense counsel to use it to impeach Officer Mace, a violation under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

At the suppression hearing held before trial, the State presented Officer Mace, who testified in pertinent part that while at Hayward's rooming house, he asked Hayward to step outside to discuss his hand wound. Officer Mace testified that he did not handcuff Hayward at that time. Officer Mace testified he then asked Hayward if he would come to the police station to discuss the hand wound, which Hayward had described as a cut inflicted by Dorothy Smith, his girlfriend. Hayward did not object to that request and was then handcuffed for the ride to police headquarters. On cross-examination, Officer Mace testified at the suppression hearing, "It's policy that any time we transport anybody in our police cars, that they're secured or handcuffed" for officer safety. Mace also said that it was "written in our POP, our policy from [the] police department. Anybody that travels in our vehicle in the back seat will be secured." Officer Mace said, "I advised him, I said, sir, you're not under arrest but for the purpose of and policy of my department I have to secure you." When asked, "If one reviewed that, that would be in there?" Officer Mace answered, "Yes, sir."

When Hayward was handcuffed in front of his body and, just before he got into the police vehicle, Hayward said something to the effect that he was not going to lie, that he was robbed the other day and he may have gotten shot. Officer Mace conveyed this information to Officer Flaherty, who was in the rooming house with Hayward's girlfriend, Dorothy Smith, who then told Flaherty that Hayward had

knocked on her window in the early morning of February 1, 2005, and had a gunshot wound to his hand.

Fort Pierce Police Captain Greg Kirk testified at the evidentiary hearing that the police department had a written policy for prisoner transport but did not have a written policy for transport of non-prisoners. That decision is left to the discretion of the officer, but he agreed there is an unwritten policy regarding transport of non-prisoners in the back seat of patrol cars. Captain Kirk trains Fort Pierce police officers regarding transportation of people who are not under arrest and has done so since 2004, and he was involved in the training class which Officer Mace attended. Captain Kirk said the unwritten policy that is taught to the officers is that if the officer believes there is a need to assure safety in the transportation of a person, the person should be handcuffed and told that the procedure is for their safety and officer safety, even if the person is volunteering to come to the police station.

The postconviction court held:

> Hayward presented no evidence rebutting the [Fort Pierce Police Department] handcuff practice or the related officer training, or proving that the State knew that the handcuff practice was unwritten. And it is undisputed that Officer Mace told Hayward he was being cuffed for officer safety and that he was not under arrest. Thus, the court finds no exculpatory or impeaching evidence in the fact that Officer Mace erroneously believed that there was a written handcuff policy where there was a memorialized training practice; and finds Officer Mace's misstatement that there was a written policy harmless beyond a reasonable doubt where the substance of the memorialized

training practice was conveyed to Hayward, so Hayward could not have reasonably believed that he was being detained.

Under Brady, a violation occurs "when the government fails to disclose evidence materially favorable to the accused." Youngblood v. West Virginia, 547 U.S. 867, 869 (2006); see also Riechmann v. State, 966 So. 2d 298, 307 (Fla. 2007) (citing Mordenti v. State, 894 So. 2d 161, 168 (Fla. 2004)). This obligation extends to "impeachment evidence and to evidence 'known only to police investigators and not to the prosecutor.' " Youngblood, 547 U.S. at 869-70 (quoting Kyles v. Whitley, 514 U.S. 419, 438 (1995)).

In order to demonstrate a Brady violation, the defendant has the burden to show (1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Way v. State, 760 So. 2d 903, 910 (Fla. 2000). In order to meet the materiality prong of Brady, the defendant must demonstrate " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " Youngblood, 547 U.S. at 870 (quoting Strickler, 527 U.S. at 280). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Id. at 870 (quoting Kyles, 514 U.S. at 434). A reasonable probability is a probability

- 42 -

sufficient to undermine confidence in the outcome. <u>Way</u>, 760 So. 2d at 913; <u>see also</u> <u>Strickler</u>, 527 U.S. at 290. "[R]eversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " <u>Youngblood</u>, 547 U.S. at 870 (quoting <u>Kyles</u>, 514 U.S. at 435).

A claim under <u>Giglio</u> alleges that a prosecutor knowingly presented false testimony against the defendant. In order to demonstrate a <u>Giglio</u> violation, "a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." <u>Tompkins v. State</u>, 994 So. 2d 1072, 1091 (Fla. 2008) (citing <u>Guzman v. State</u>, 941 So. 2d 1045, 1050 (Fla. 2006)). Once the first two prongs are established by the defendant, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. <u>Tompkins</u>, 994 So. 2d at 1091. The State then "has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt." <u>Id.</u> at 1092. The harmless error standard requires the State to prove "that there is no reasonable possibility that the error contributed to the conviction." <u>State v. DiGuilio</u>, 491 So. 2d 1129, 1138 (Fla. 1986)).

<u>Giglio</u> and <u>Brady</u> postconviction claims present mixed questions of law and fact and, where the trial court has conducted an evidentiary hearing, this Court will

defer to the factual findings of the trial court that are supported by competent, substantial evidence, but will review the application of the law to the facts de novo. Lynch v. State, 2 So. 3d 47, 56 (Fla. 2008) (citing Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004)); see also Lowe v. State, 2 So. 3d 21, 29 (Fla. 2008) ("Generally, this Court's standard of review following a denial of a postconviction claim where the trial court has conducted an evidentiary hearing accords deference to the trial court's factual findings." (citing McLin v. State, 827 So. 2d 948, 954 n.4 (Fla. 2002))). " '[T]his Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.' " Id. at 30 (quoting Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997)).

Simply because Officer Mace erroneously stated that the policy on transporting persons in the patrol car was written does not prove that the falsity was purposeful, or that the State knew that it was false or knew that there was a written policy that contradicted Officer Mace's testimony. Thus, no Giglio violation was shown.

Under Brady, however, exculpatory or impeaching evidence that is inadvertently suppressed by the State can be the basis for a finding of violation if the evidence was material, thus causing prejudice to the defendant. In this case, the State did not disclose that the written policy did not expressly extend to

handcuffing non-prisoner passengers in the patrol car. Even so, Hayward failed to demonstrate that had trial counsel been provided the written policy, and had it been used to impeach Officer Mace, there is a reasonable probability—defined as one sufficient to undermine this Court's confidence in the outcome—that the statements would have been suppressed after the hearing or that the jury at trial would have found the statements involuntary. It cannot be said that if Officer Mace had been confronted with, and impeached by, a copy of the written policy, the whole case would have been viewed in such a different light that confidence in the verdict would be undermined. It is likely that Office Mace would have simply responded that he was in error concerning the terms of the written policy, but that there was clearly an unwritten policy that he had been taught concerning handcuffing of persons traveling in the back of a patrol car. As evidenced by the testimony of Captain Kirk at the evidentiary hearing, the officers were taught to use their discretion and to err on the side of safety whenever transporting persons in the back of a patrol car.

Based on the foregoing, we conclude that no Giglio or Brady violations have been established in regard to Officer Mace's testimony at the suppression hearing or trial. Even though the trial court granted an evidentiary hearing on the issue of the written transport handcuffing policy only as it related to the Brady and Giglio claims, Hayward now states the issue as primarily one of ineffective assistance of

- 45 -

counsel and primarily argues it in that context. The postconviction court did address this <u>Strickland</u> claim very briefly in denying relief as to the handcuffing policy claim. After concluding that nothing impeaching or exculpatory arose from Officer Mace's erroneous testimony, the postconviction court also held that Hayward had failed to carry his burden under <u>Strickland</u>.

Hayward contends on appeal that trial counsel was deficient in not obtaining a copy of the Fort Pierce Police Department prisoner transport policy prior to the suppression hearing. He contends that because Udell did not seek out a copy of a written policy on handcuffing, "trial counsel was not able to impeach Mace's credibility after he lied to the court about the written policy." Hayward points out that a simple public records request would have resulted in disclosure of any handcuffing policy at the police department, but that Udell made no such efforts. Hayward also points out that trial cocounsel Jerome Stone testified at the evidentiary hearing that if Officer Mace could be shown to be "flat out lying," such would adversely affect his credibility. Hayward contends Officer Mace's "false testimony was material" and Hayward was prejudiced, because it was after he was handcuffed for the ride to the police station that Hayward made the incriminating statement that he had been shot in the hand.

We disagree that ineffective assistance of counsel has been established. Even if trial counsel should have sought out any written or unwritten handcuffing

policy prior to the suppression hearing and trial, Hayward has failed to prove the second prong of Strickland—prejudice. To establish prejudice, the defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." White v. State, 964 So. 2d 1278, 1285 (Fla. 2007) (quoting Strickland, 466 U.S. at 694). Importantly, that reasonable probability is evaluated and expressed in terms of "a probability sufficient to undermine confidence in the outcome." Id.

Regardless of the existence or non-existence of a written policy concerning transport of non-prisoners, and regardless of Officer Mace's error in testimony, the incriminating statement that Hayward gave after being handcuffed was spontaneous and not the product of interrogation. Further, once at the police station, and after Hayward was given Miranda warnings, Hayward made several more incriminating statements to the police which did not involve Officer Mace. Thus, Hayward has failed to prove both prongs required under Strickland, in that the matters brought to light here do not undermine our confidence in the outcome of either the suppression hearing or the jury trial.

## C. Summary Denial of Certain Postconviction Claims

### 1. Summary Denial of Claim that Trial Counsel was Ineffective in Failing to Object to Prosecutorial Comment in Closing Argument

In penalty phase closing argument, the prosecutor used victim impact evidence to discuss, and essentially compare, the life choices made by the victim with the life choices made by Hayward. Trial counsel failed to object and a claim of fundamental error was raised on direct appeal. This Court found the argument to be erroneous, but not fundamental. Hayward contends that if counsel had timely objected, the error would have been measured not by the fundamental error standard but by the harmless error standard in which the burden would have been on the State to prove it was harmless beyond a reasonable doubt. On direct appeal, we stated:

> During the penalty phase closing argument, the prosecutor reminded the jury about how Destefano had worked toward his goal of buying a Harley-Davidson, and then stated, in part, as follows:
>
> > One thing we learned about Danny was that Danny set his sights on something and then worked towards that . . . goal . . . . Because he had a goal in mind. And he recognized that choices, you see, choices that he made in his life will take him to his goal. Because in the end, ladies and gentlemen, it all comes down to choices we make. As human beings we have free will. We have the ability to control our destiny. When you make a choice, you may make a choice that is well [intentioned] and bad things happen. And we recognize it that unfortunately you may have to pay the consequences for that. Sometimes you make decisions, good things happen, they turn out the way you want.

> Sometimes you make decisions in your life for the wrong reasons but knowing why. Steven Hayward did just that. Steven Hayward sits at this table today not as a result of anything anybody did to him, any of the conditions in his life, but because of very simply he made some choices. He exercised his free will and his free will brings him here today and this places him in this condition of life.

Hayward, 24 So. 3d at 40.

On direct appeal, we held that although the victim impact evidence itself was proper, the prosecutor's use of it to make the comparison was improper. Id. at 41. We stated:

> Having reviewed the improper prosecutorial comments in the context of the entire closing argument and in light of the evidence presented in the penalty phase, we conclude that the improper prosecutorial comments in this case do not rise to the level of fundamental error. Given the strength of the evidence against Hayward and the gravity of the aggravators, we cannot say that the jury would not have recommended a death sentence or that the trial court would not have imposed a death sentence if the prosecutor had not made the improper victim impact comparison.

Id. at 42. For these same reasons, we conclude that Hayward has not established the second prong of Strickland.

Further, despite the prosecutor's brief comparison of the choices Destefano made in life and those made by Hayward, the prosecutor did not argue that Destefano's life was somehow more valuable than Hayward's life. The comment appears to have been aimed more at pointing out that it was no one's fault but Hayward's—based on the choices he made in life—that he was sitting in court

convicted of the crime of murder.  The prosecutor's comparison, when considered in context, while improper, does not undermine the Court's confidence in the outcome of the penalty phase.  In the sentencing order, the trial court found three aggravators.  The court found the prior violent felony conviction aggravator based on a conviction for second-degree murder and two counts of armed robbery for which the court assigned "extremely great weight."  The court also found that the murder in this case was committed during a robbery, which aggravator was merged with the pecuniary gain aggravator.  This combined aggravator was given "great weight."  The jury and the court were provided strong evidence of these aggravators.

Therefore, we conclude that even if counsel had objected to the improper comparison, there is no reasonable probability that the result of the proceeding would have been different—a reasonable probability being one sufficient to undermine confidence in the outcome.  Strickland, 466 U.S. at 694.  Thus, relief is denied on this claim.

### 2. Summary Denial of Claim that Trial Counsel Provided Ineffective Assistance in the Motion to Suppress by Failing to Argue Coercion

Hayward contends the postconviction court erred in denying a hearing on the claim that trial counsel was deficient in failing to argue at the motion to suppress hearing that the statements at the police station were coerced.  Hayward contends that he was told he was not under arrest but was shackled to the floor, that he did

not understand the Miranda warnings, and did not fully waive his rights. Hayward contends that he indicated he did not want to answer questions by asking numerous times to make a telephone call, but his requests were denied. Hayward contends that trial counsel was ineffective in failing to argue as grounds to suppress that he was kept in the cold and in pain from his hand wound during the interrogation.

An evidentiary hearing was not required on this claim because all the facts argued by Hayward appear in the transcript of the trial wherein the State introduced Hayward's statement made at the police station by way of a videotape with accompanying transcript. At the outset of the videotape, when asked how he was doing, Hayward stated that he was cold. Detective Flaherty responded, "Cold. All right. We'll see if we can get you something. Get this stuff out of the way." Although the record does not show if anything was done about Hayward being cold, he did not complain about it again. Detective Flaherty also stated, "Before we talk about that [the hand injury] we got to do the Miranda." Detective Coleman then read Hayward his Miranda warnings and, when asked if he understands his rights, Hayward answered, "Yeah." When asked if he was willing to answer some questions, Hayward's answer is recorded by the court reporter as "inaudible." Detective Flaherty then tells Hayward, "Just sign right here."[11]

_____

11. Much later in the interview, Hayward says he did not do anything wrong, and if he had, he would not have signed "that paper" and would not be

Also at the outset of the interview, Detective Flaherty said, "Just go ahead and tell us what happened, when it happened and where it happened and go from there." Hayward then proceeded to tell the detectives that he was at a building on 17th Street and was robbed by two men, and when Hayward grabbed for the gun, it went off and he was shot in the hand. Hayward's answer, and his description of the event and what happened when he returned to the rooming house, continued for a fairly lengthy period of time. At one point, the detective asked Hayward if he wanted to go to the hospital for his hand injury, but Hayward declined.

Later, when Hayward said he was in pain, and his bandage had come off, the officers said they would get some tape to put on a fresh bandage and left the room. Some minutes later Hayward asked, for the first time, to make a telephone call to his mother and was told, "Let's get through this first." Hayward then said, "I been here for over two hour[s]" . . . I need to . . . talk to somebody." He repeated that he needed to talk to his "mama." Again, Hayward was told, "[T]ell us from the beginning so we can get through this." Hayward then said again that he wanted to talk to his "mama" but when the officer asked if he wanted to talk to his "mom," Hayward said, "I ain't calling my mom. I want to call somebody else." The

---

sitting there talking to the police. This confirms that Hayward understood the content and import of the <u>Miranda</u> waiver and that he signed it.

detective responded, "I want to hear your story first though and then we'll do that." Hayward never said he wanted to call an attorney.

Hayward then reiterated the statement he gave earlier about a Mexican man and a black man robbing him, and that when he fought for the gun, it went off and he was shot in the hand. He repeated his statement that he ran back to the rooming house and told his girlfriend he had been shot, and that he refused to go to the hospital for treatment. When asked about the man in the car who was shot, Hayward strenuously denied shooting the "paper boy" in the car, referring to Destefano, whose murder Hayward said he had heard about.

After being confronted with the fact that several witnesses had given statements that conflicted with the story told by Hayward, and after discussing for a period of time about whether Hayward shot Destefano, Hayward said, "I need a pain pill, man, or something, man." The detective responded, "Hey, don't worry. We'll take care of you. . . . Get this off your shoulders, man." There was no later discussion about pain.

Hayward changed his statement, again, this time to say that he saw a man rob and shoot Destefano. He said the man and Destefano were fighting, that there was another man involved, and that when both men ran away, one dropped a gun. Hayward said when he reached to pick up the gun, it fell and he was shot in the hand. Hayward said he took the gun with him and later sold it for $50. He also

- 53 -

admitted to going through Destefano's car and said that would account for any of his blood the officers suggested would be found there. When Detective Coleman told Hayward his story was not believable and was not in accord with what two witnesses told them, Hayward reiterated that he went into the car but did not shoot Destefano. The videotape statement was concluded.

There is no dispute that Hayward was read his <u>Miranda</u> rights and agreed to waive them. He even referred to having signed the waiver. The fact that he was cold or in pain did not interfere with the different self-serving versions of the incident that he gave the detectives. He never asked to call an attorney and never asked to cease the interrogation. Hayward has provided no authority holding that an interrogation must cease if an adult suspect asks to telephone his mother or some unspecified "somebody." Nothing that transpired in the interrogation supports the conclusion that Hayward did not know and waive his <u>Miranda</u> rights or that he was coerced in any way during the interrogation.

Even if trial counsel had argued coercion or lack of understanding of the <u>Miranda</u> rights or waiver, there is no reasonable probability—measured in terms of whether our confidence in the outcome of the guilt phase of trial is undermined— that the statements would have been suppressed or that a verdict of not guilty would have been entered.

### 3. Summary Denial of Claim that Trial Counsel Provided Ineffective Assistance in the Guilt Phase by Not Vigorously Challenging the State's Witnesses

Hayward contends that trial counsel was deficient in failing to vigorously advocate for him by not effectively challenging the State's witnesses during the guilt phase by cross-examination or motion to disqualify. Hayward also contends that an evidentiary hearing should have been granted. Although he broadly states "numerous witnesses" were not challenged, Hayward focuses only on two—Roosevelt McDowell and Dorothy Smith.

### Roosevelt McDowell

Hayward focuses first on the testimony of Roosevelt McDowell, who gave several statements to police and who testified during the guilt phase. Hayward contends that McDowell's statements were conflicting, in that he told police variously that the suspect was a black male wearing dark clothing and some type of ski mask or cap, that he had dreadlocks with nothing on his head, that McDowell did not see any stocking cap, and that the suspect was wearing a hat. Hayward contends McDowell's pretrial statement and his trial testimony also conflicted as to whether he saw the suspect with a gun, and whether he was awake when he heard gunshots or whether the gunshots woke him up.

Hayward contends that these conflicts in McDowell's testimony demonstrate that he was "infirm" when the State presented his testimony, which is confirmed

by McDowell advising trial counsel that he had cancer and other ailments and was taking medication for high blood pressure. Hayward contends that "his inconsistent testimony and his inability to recall even the most basic details of the events he purportedly witnessed put counsel on notice that he should be disqualified as a witness because he lacked capacity to accurately observe, recall and narrate facts."

The State counters that these discrepancies do not support disqualification but only go to the weight to be assigned by the trier of fact. The State points out that Hayward failed to plead facts calling into question McDowell's ability to observe or his capacity to understand the oath, and failed to allege that McDowell did not personally observe the facts he reported. The State also contends that trial counsel brought out these conflicts in testimony on cross-examination, and that trial counsel was not deficient for failing to move to disqualify McDowell because he had no legal grounds to do so. The postconviction court summarily denied relief on this claim, finding it legally insufficient for failing to allege facts demonstrating that McDowell was incompetent or that there was any other legal basis for disqualifying McDowell. The postconviction court did not err in denying an evidentiary hearing and in denying relief on this claim concerning witness McDowell.

Regarding the summary denial of trial counsel's failure to challenge the capacity of Roosevelt McDowell to testify, the postconviction court was correct that the facts alleged in the motion were legally insufficient upon which to base a claim that trial counsel was deficient in failing to move to disqualify McDowell. The claim filed by Hayward in his amended postconviction motion alleged that McDowell's various versions of events demonstrated his inability to recall basic details, which Hayward argues is sufficient for counsel to have been obligated to move to disqualify him as a witness. This Court has held that a witness is incompetent to testify if the witness is unable to communicate to the jury, unable to understand the duty to tell the truth, or is unable to perceive and remember events. Rutherford v. Moore, 774 So. 2d 637, 646 (Fla. 2000). Section 90.603, Florida Statutes (2007), provides that a person is disqualified as a witness if the person is incapable of expressing himself or herself concerning the matter or is incapable of understanding the duty to tell the truth. Section 90.604, Florida Statutes (2007), provides that a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Had the motion to disqualify McDowell been made at trial, the court would have had broad discretion in ruling as to his competence to testify. See, e.g., Baker v. State, 674 So. 2d 199, 200 (Fla. 1996).

The fact that the witness gave differing versions of events is not necessarily attributable to an inability to remember. Thus, Hayward's claim was legally insufficient in this regard as it was founded on speculation. Moreover, Hayward did not allege that the witness could not communicate, that he did not understand the oath to tell the truth, or that he was not an eyewitness to the incident.

The record shows that trial counsel cross-examined McDowell extensively concerning his differing versions of the event. McDowell, age 62, testified that at approximately 4:30 a.m. on the morning of the murder, he was on the way to the bathroom when he heard someone "hollering," "I don't have no more, I don't have no more." He testified he then heard two "small" shots and then a "big shot." He first testified that there were ten to fifteen minutes between the shots, then he immediately changed that to say the big shot occurred right after the small shots. He testified that after the shots were over, he opened the door and looked out from his ground floor apartment. He saw a car by the convenience store with the car's trunk and driver's side door open.

McDowell testified he saw two people, one who looked like a "Mexican" male on the ground on one knee. The other person, a black male, was standing up. McDowell testified that the man standing had dreadlocks on his head and nothing else. McDowell later testified on redirect that the man had something over his face. McDowell testified that the black male had searched the car then "went to

- 58 -

the light to hold his hand," referring to looking at his hand under a street light. McDowell further testified that the victim left the scene limping and holding his side, while the black male remained by the light looking at his hand. He said the man wrapped his hand and left the scene, going behind McDowell's building.

On cross-examination by trial counsel Jerome Stone, McDowell said he never saw a gun in the black man's hand. McDowell again testified he did not see anyone wearing a stocking cap over his face, although on redirect he said there was something over the black male's face. McDowell also agreed on cross-examination that there could have been other people on the scene that he did not see. McDowell admitted that during deposition he testified the black male roughed up the victim, but at trial he testified that he saw no roughing up. Even though the postconviction court denied a hearing on the claim concerning McDowell, trial counsel Stone testified at the evidentiary hearing that he was selective in cross-examining McDowell because he was an older gentleman in poor health and counsel did not want to appear to be beating up on him in front of the jury.

McDowell's prior inconsistent statements did not establish that he could not remember the incident, but only that he did experience some confusion about certain details. Much of his testimony concerning the event was confirmed by other evidence, including that the victim left the scene, that the assailant had something wrong with his hand, that the assailant went into the car where

- 59 -

Hayward's blood was found, and that the assailant left and went behind the apartment building, again where Hayward's blood was found on a post. Some of McDowell's apparent confusion was pointed out to the jury and would have been a matter for them to consider in deciding what weight to give to this witness's testimony. Other conflicts in testimony, concerning whether the assailant wore a hat or face covering, were apparent in the witness's testimony, and again would have been a matter for the jury to weigh in determining credibility. In closing argument in the guilt phase, trial counsel argued that McDowell was in poor health, and counsel pointed out the inconsistency in McDowell's testimony concerning whether the assailant roughed up Destefano and whether McDowell saw a hood or a mask on the assailant.

Relief is denied on this claim. Hayward did not allege grounds to disqualify McDowell and, even if such grounds did exist, our confidence in the guilty verdict is not undermined by trial counsel's failure to move to disqualify McDowell as a witness or to more effectively cross-examine him at trial.

Dorothy Smith

Hayward also claims on appeal that the postconviction court erred in summarily denying his claim that trial counsel was deficient in failing to challenge the testimony of Dorothy Smith. He contends that it was not brought out before the jury that she had a history of schizophrenia for which she had been hospitalized

and was taking medication, all of which affected her ability to recall and narrate facts and left her susceptible to police coercion. He argues that trial counsel's cross-examination was brief and inadequate, and failed to disclose that she had a felony record.

The postconviction court denied the claim, finding it legally insufficient because the motion failed to allege specific facts in relevant time frames, and did not demonstrate prejudice. The amended postconviction motion alleged that Smith had a history of mental illness that affected her ability to recall and narrate facts, and left her susceptible to police coercion. It also alleged that trial counsel failed to elicit from her on cross-examination the fact that she suffers from mental illness and had previously been hospitalized for a mental illness. The motion alleged trial counsel was aware of her mental health history and her prior arrests, and that she had been coerced into changing her story in Hayward's case by police. The motion also alleged that trial counsel knew that Smith had lied to police about Hayward's whereabouts on the night of the crime but failed to cross-examine her on that fact.

The State counters that Hayward failed to explain how counsel was deficient or how the result of the trial would have been different, and argues that his conclusory allegations are insufficient. The State is correct that even without Smith's testimony, other eyewitness testimony and forensic evidence, along with

Hayward's own statements, established that Hayward killed Destefano during an armed robbery.

During the State's presentation of Dorothy Smith's testimony at trial, she reiterated that Hayward came to her window at the rooming house in the early morning hours of February 1, 2005. She said she let him in and he told her he was robbed by two men and had been shot in the hand. When she heard news about the murder, she asked him about it and he told her he did not do it. This testimony was in accord with one of the versions that Hayward told police. During his interview, he told detectives that he ran to the rooming house and knocked on the window because he did not have his key. Hayward also told detectives that he had not been stabbed in the hand, but had been shot in the robbery attempt by two men when he attempted to take their gun away. Smith also testified that the day after this occurred, Hayward sold a silver gun. This testimony was in accord with Hayward's statement to detectives that he took the silver gun with which he was shot in the hand and later sold it for $50. On cross-examination, trial counsel did bring out the fact that Dorothy Smith was a convicted felon.

Smith's testimony was not particularly harmful, in that it simply repeated some of the same things that Hayward told police, although he admitted when he testified that the claim he was robbed by two men was a lie. Cross-examining Smith to bring out the fact that she had mental health problems or was on

medication that affected her memory would not have changed the fact that Hayward told the police that he knocked on her window to be let in and that he told her he had been shot in a robbery attempt, just as Hayward told police. Nor would it have changed the fact that Hayward told detectives that he took the gun and sold it. Thus, even if trial counsel was deficient in making only a cursory cross-examination of Smith, Hayward has failed to demonstrate prejudice. For these reasons, we conclude that denial of the claim regarding Smith was proper.

### D. Whether Errors Occurred that Denied Hayward a Fair Postconviction Proceeding

### 1. Motion to Disqualify Office of State Attorney

Hayward claims that several rulings of the circuit court deprived him of a full and fair hearing. The evidentiary hearing in this case was held on February 27, 2012, through March 1, 2012, and was concluded on March 28, 2012. On March 15, 2010, several years prior to the evidentiary hearing, Hayward filed a motion to disqualify the Office of the State Attorney for the Nineteenth Judicial Circuit, alleging that the office had violated Hayward's right to attorney-client privilege. The motion alleged that trial counsel had turned over trial files to the Office of the State Attorney. This fact was learned in a March 2, 2010, e-mail from Assistant State Attorney Ryan Butler confirming that his office had received one banker's box of trial files from Udell and that Butler would "submit it to the Records Repository." On that same date, postconviction counsel replied to Butler

- 63 -

that he was extremely concerned that trial counsel had provided privileged and confidential files to the State without Hayward's knowledge or consent and further demanded that the box of files not be sent to the records repository but be sent instead to successor counsel. The motion to disqualify further alleged that as of March 15, 2010, Capital Collateral Regional Counsel (CCRC) had not received the box of files.

Because the State Attorney's office was in possession of the files for several weeks and thus had the opportunity to review, copy, disseminate, or alter the files, Hayward alleged that the office must be disqualified. On March 16, 2010, Assistant State Attorney Butler filed a notice with the court that the "sealed files of petitioner's trial counsel, Robert Udell, have been filed with the court." On March 19, 2010, Hayward's postconviction counsel filed an emergency motion for release of the trial files to postconviction counsel. At a status conference on March 31, 2010, the postconviction judge noted that the box of trial files was in his office. When asked how that came about, Jerome Stone stated that he and Udell had spoken by telephone and Udell advised that since he was disbarred[12] and had shut down his practice, he was not able to store the file. Stone said Udell delivered the box to Stone's office and, because Udell told him it should go to the State

_____

12. Robert Udell was disbarred for matters unrelated to this case.

Attorney's office, Stone gave the unsealed box to Ed Arens, a State Attorney investigator.

Assistant State Attorney Butler was questioned by the court under oath and stated that he contacted Udell after he heard Udell had been disbarred and asked if Udell had a place to store the file, to which Udell answered that he did. Butler testified that several weeks later, Udell called him and said he was requested by CCRC to provide a copy of Hayward's file and that Udell did not have the funds to make the copy. Butler said that he knew that "under the case law we were going to get the file anyway," referring to what he thought would likely occur after a 3.851 motion alleging ineffective assistance of counsel was filed, so he agreed to copy the files, keep a copy, and give the files to CCRC. Butler said he received the box and when, several weeks later postconviction counsel objected, Butler sealed the box with tape. He testified that he did not look in the box and believed no one else in the State Attorney's office did either. At that hearing, the court returned the files to trial counsel Jerome Stone, to comply with Florida Rule of Criminal Procedure 3.851(c)(4).

On April 1, 2010, the circuit court entered an order finding that "disbarred attorney Robert Udell's original trial files were improperly released to the Office of the State Attorney" and that they should have been delivered to new counsel at CCRC. Although the court also found that no evidence was presented

demonstrating that the integrity or confidentiality of the files had been compromised, the order allowed additional time for Stone to review the files with Udell to determine if the integrity or confidentiality of the files had been compromised. The court reserved ruling on the motion to disqualify the Office of the State Attorney until after CCRC completed discovery concerning who had access to the files after they were picked up from Stone's office and before the box was sealed by Assistant State Attorney Butler. Pursuant to the order, Udell filed a sworn affidavit on April 13, 2010, stating that he had received the original trial file and met with Jerome Stone to review it, and "[b]ased upon this review I have determined there to be no compromise with the integrity or confidentiality of the file."

Postconviction counsel conducted depositions pursuant to the April 1, 2010, order and, on August 9, 2010, filed a memorandum concerning the motion to disqualify. The State also filed its memorandum and a hearing was held on October 11, 2010, on the motion to disqualify at which the circuit court noted that postconviction counsel would be required to show actual prejudice in order to prevail on the motion to disqualify. Postconviction counsel conceded that "I have to take the State's representation that no one inspected the files and that there was no privileged material that they're aware of that they have learned of." However, counsel argued that because this is a death penalty proceeding, the circumstances

surrounding the transfer of the files prejudices Hayward in his reliance on the integrity of the process. When asked if he had any evidence of actual prejudice, counsel had to concede that he did not.

In his ruling, the judge stated that he had reviewed all the depositions taken by postconviction counsel, which included depositions of Thomas Bakkedahl, Chief Assistant State Attorney and Hayward's trial prosecutor; Carla Porter, Executive Secretary to several attorneys in the State Attorney's office; Jeff Hamrick, State Attorney Investigator; Edward Arens, State Attorney investigator; Christopher Taylor, Assistant State Attorney and Hayward's trial prosecutor; Robert Udell; and Ryan Butler, Assistant State Attorney in the postconviction proceeding. The court held that, although the disposition of the file was improper, postconviction counsel was unable to identify any actual prejudice that resulted from the disposition of Udell's trial file in the case. The court further found that nothing in any of the depositions suggested that the file was viewed by anyone in the State Attorney's office, and that the box sat untouched in Butler's office until it was taken to the judge's office. Thus, the motion to disqualify the Office of the State Attorney was denied.

Hayward now contends that the trial court erred in denying his motion to disqualify the office of the State Attorney and, as an additional ground for the motion to disqualify, Hayward points out that Udell was given a contribution of

between $300 and $500 from various attorneys, including some in the Office of the State Attorney, from the time that he was disbarred up to the time he turned the files over to that office. Chief Assistant State Attorney Bakkedahl confirmed in his deposition that he and other personnel at that office made contributions after Udell was disbarred and was in trouble financially. Hayward contends that "the fact that State [Attorneys] gave money to a potential witness is a significant conflict of interest" and that the "relationship alone jeopardized Hayward's right to fair postconviction proceedings, warranting the State Attorney's disqualification." The State counters that the donations were anonymous in the form of Publix gift cards when Udell was in financial difficulty following his disbarment.

The circuit court did not err in denying the motion to disqualify the Office of the State Attorney. Denial of a motion to disqualify a State Attorney's office is reviewed for abuse of discretion. Rogers v. State, 783 So. 2d 980, 991 (Fla. 2001). We explained in Rogers that "although we have stated that the appearance of impropriety created by certain situations may demand disqualification, we have evaluated such situations on a case-by-case basis." Id. (quoting Bogle v. State, 655 So. 2d 1103, 1106 (Fla. 1995)). We held in Downs v. Moore, 801 So. 2d 906 (Fla. 2001), that "[t]o disqualify the State Attorney's Office, a defendant must show substantial misconduct or 'actual prejudice.' " Id. at 914. "Actual prejudice" is

more than the mere appearance of impropriety.  Id.; see also Kearse v. State, 770

So. 2d 1119, 1129 (Fla. 2000).

In this case, the circuit court recognized the impropriety of the transfer of the

trial file to the Office of the State Attorney.  However, the circuit court correctly

found that no evidence was presented that anyone at the State Attorney's office

viewed any portion of the files.  To the extent that the transfer simply provides an

"appearance of impropriety," this does not rise to the level necessary to require

disqualification.  The postconviction court did not specifically address the added

factor that some personnel at the State Attorney's office donated funds toward the

gift card for Udell, who was struggling financially after his disbarment, but

Hayward has failed to provide any proof that the anonymous donations influenced

Udell's testimony or prejudiced Hayward in any way.  Moreover, the record shows

that Assistant State Attorney Butler, who handled the postconviction proceeding in

this case, did not donate any of those funds.  Thus, Hayward's claim that this

additional factor provides a basis for disqualification of the State Attorney's office

lacks merit and relief is denied on this claim.

### 2.  Claim that a Full and Fair Evidentiary Hearing was Denied by Denial of Right to Call Mitigation Witness Samuel Peaks

Hayward contends that his inability to call proposed mitigation witness

Samuel Peaks deprived him of a full and fair evidentiary hearing.  Peaks was

incarcerated at FCI Coleman, a federal correctional institution, at the time that a

Writ of Habeas Corpus Ad Testificandum was issued by the circuit court for Peaks to testify. Hayward contends the Federal Bureau of Prisons was not cooperative and would not provide Peaks to testify. Because Peaks could not appear in person to testify, postconviction counsel wanted to perpetuate Peaks' testimony by deposition, but the circuit court insisted that such was not authorized by Florida Rule of Criminal Procedure 3.190 until Hayward could show that Peaks was otherwise unavailable. Hayward states in his brief that eventually "counsel was informed by FCI Coleman that there's no way Peaks' perpetuated testimony was going to happen." Hayward argues that "[t]he warden's arbitrary denial, without a reason or explanation, resulted in a denial of due process." He does not allege any error on the part of the circuit court.[13]

Rule 3.190(i)(6) provides in pertinent part that perpetuation of testimony by deposition is allowed only if the attendance of the witness cannot be procured. The circuit court was informed that the reason the prison denied access to Peaks was because it was a security risk for Peaks to appear and because he was a behavior management problem. The State and the circuit court both took the position that if

_____

13. As noted, Hayward is not contending that the circuit court erred in any respect in denying his request to perpetuate testimony under rule 3.190, nor would such a claim have merit. This Court has held that rule 3.190 applies to trials, not postconviction proceedings where discovery is limited, and that a motion to perpetuate testimony lies within the discretion of the trial court. See, e.g., Hurst, 18 So. 3d at 1007 (citing Riechmann v. State, 966 So. 2d 298, 310 (Fla. 2000)).

Peaks could testify by video, he was not unavailable under the rule, and thus perpetuation was improper.

Hayward failed to establish that he was denied due process in his inability to secure the testimony of Samuel Peaks. First, postconviction counsel repeatedly advised the court that he would not present Peaks' testimony by videoconference because he believed that method was not in the best interest of his client. Postconviction counsel argued to the circuit court that Peaks, who was the cousin who came to live in Hayward's household, could testify to "evidence of the family and the effect of his coming to the family later on in life, as well as - - as an infant" and that he had "a unique perspective on the situation in Mr. Hayward's family when he was growing up." The postconviction court advised counsel that, based on the amended postconviction motion, Hayward could present the same evidence through his mother or by Hayward himself.

Somewhat later in the evidentiary hearing, which lasted several days, postconviction counsel again told the court he would not present Peaks by videoconference, but wanted to perpetuate testimony by deposition, to which the court responded, "but you have to show he's unavailable before you can; it's not a matter of choice." When the court pointed out that it did not appear postconviction counsel had attempted to secure the testimony by videoconference, counsel responded, "I'm not sure I can ask a federal prison to make accommodations for

- 71 -

me to do something that I have no intention of doing."  The court then advised counsel, "[Y]ou're still unilaterally pursuing a method to get his testimony before me in a fashion that is not permitted by the rules until he's found to be unavailable."  The next day, counsel advised the court that there was nothing further he could do concerning the request to call Peaks to testify because "I'm not going to be able to call him the way that I feel that I should be able to call him."  Counsel again told the court that even if the prison allowed Peaks to testify by video, counsel had no intention to present him in that fashion.  Again, the court urged counsel to pursue any avenues with the prison to obtain Peaks' testimony.  And, later in the same hearing, the court advised counsel that he could present Peaks' testimony by video if he so chose, although the court understood that counsel had said in good faith that he did not want to do that.

Hayward claims he was denied due process, and received less than a full and fair hearing, because the warden would not allow Peaks to appear and testify.  However, the testimony that counsel contended he would present through Peaks could have been presented by either of Hayward's older sisters or by his mother, who were in a better position to know the effect on Hayward caused by an infant coming into the home.  In fact, Hayward's sister, Debra Fleury, testified at the evidentiary hearing that Samuel Peaks came to live with them when he was a baby and Hayward was only several years older.  She said this affected Hayward

because he was not the center of attention anymore and "needed to move out of the way so Sam could be cuddled." Hayward "could not be the baby anymore."

Regardless of what testimony Peaks could have provided, the circumstances of Hayward's inability to present Peaks' testimony, either in person or by deposition rather than by video, do not establish that he was denied due process or a fair hearing because the federal prison refused to honor the subpoena in the case. Moreover, he has not provided any basis on which the Court can conclude that he was entitled to present Peaks' testimony by way of perpetuated deposition testimony, which is the only way in which he was willing to present this witness regardless of the possibility of presenting his testimony by videoconference. It was by choice that counsel did not seek to present Peaks' testimony by videoconference, and thus counsel failed to show the witness was unavailable under rule 3.190. Accordingly, relief is denied on this claim.

### 3. Claim that Hayward Did Not Receive a Full and Fair Evidentiary Hearing Because the Circuit Court Refused to Consider Certain Mitigation Evidence

The postconviction court excluded certain testimony by Hayward's mother, Barbara Johnson, concerning her childhood with foster parents Daisy and Lawrence Green in South Carolina, and how she met her first husband, Harold Hayward. As explained above, the testimony was proffered that Barbara's mother placed her and her brother with "foster parents" Daisy and Lawrence Green, where she was beaten regularly, made to quit school in eighth grade, and forced to work

in the fields picking crops. Hayward attempted to present his mother's testimony about how she was sent to New York where she became pregnant, and how she returned to the Greens where she had the baby she named Derrick. Barbara was made to marry Harold Hayward and they moved away.

The circuit court also excluded some of the mitigation testimony of Derrick Green, Hayward's half-brother. Green was not allowed to testify about the abuse he suffered in South Carolina at the hands of the Greens, and on proffer, he testified that he regularly received beatings from them with a switch or other object from the age of five to eleven when his mother came to get him. When he was eleven, his mother, Harold Hayward, and Tony Johnson took him away from the Greens after his cousin called to report the abuse he was receiving there.

Some of the testimony of Cecilia Alfonso, a mitigation specialist who attempted to testify about the cycle of violence in the Hayward family that began with abuse of his mother, was also excluded. As with the testimony of Hayward's mother and brother, the circuit court held this evidence was not relevant. Alfonso also testified on proffer that the mother's childhood experiences were relevant mitigation for Hayward because it showed she raised her children in an abusive manner just like her foster parents raised her, and as a consequence, that type of violence was internalized by Hayward, and his ability to develop a sound decision-making process was adversely affected.

Hayward contends on appeal that evidence of his family history showing a cycle of inter-generational violence was relevant because it shows what influences shaped and contributed to the development of the defendant. Hayward also cites the commentary to ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7 (rev. ed. Feb. 2003), which states that "[a] multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." The State contends that the evidence was properly excluded because it went more to the character of the testifying witnesses than to Hayward's character, citing our decision in Hill v. State, 515 So. 2d 176 (Fla. 1987). In Hill, we held that the trial court did not abuse its discretion in excluding testimony that Hill's mother cared for his cousins as well as her own children and testimony about the ill health and job responsibilities of Hill's father. We explained, "In our view, the excluded evidence focused substantially more on the witness's character than on appellant's." Id. at 178. In the present case, just as in Hill, the excluded evidence focused substantially more on the witnesses' experiences that shaped their character before Hayward was even born.

Hayward is correct that the commentary to ABA Guideline 10.7 states, "A multi-generational investigation frequently discloses significant patterns of family

dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." However, this commentary provides no blanket rule or constitutional requirement concerning testimony of abuse suffered in the childhood of a defendant's parents or siblings when that abuse occurs somewhere other than in the home of the defendant. Moreover, the ABA Guidelines are not mandatory, but are only guides. See, e.g., Strickland, 466 U.S. at 688.

The admission of evidence is within the sound discretion of the trial court, constrained by the application of the rules of evidence and the principles of stare decisis. Davis v. State, 121 So. 3d 462, 481 (Fla. 2013). The circuit court did not abuse its discretion in excluding the testimony of what occurred in the Green household in South Carolina when Barbara Johnson lived there and when her son, Derrick Green, was left there as a child. Ample evidence was presented that Barbara Johnson and Hayward's father disciplined him frequently with belts, switches, hands, and other items, and did so harshly. Evidence was admitted that his mother and his sisters believed that was normal discipline at the time. Evidence that Barbara Johnson and Derrick Green were abused by the foster parents in South Carolina does not add substantially to the mitigating nature of what Hayward went through as a child and young teen.

For these same reasons, even if the circuit court abused its discretion in excluding this testimony from Johnson, Green, and Alfonso, such error was harmless beyond a reasonable doubt. To the extent that it was intended to support evidence that Hayward's mother beat him and thought that was proper discipline, similar evidence was presented through other witnesses including Johnson herself. Accordingly, the circuit court did not err in excluding this proffered evidence.[14]

### 4. Claim that a Full and Fair Evidentiary Hearing was Denied by the Court Prohibiting Questioning of Trial Counsel Udell about Communications from Assistant State Attorney Ryan Butler Prior to the Evidentiary Hearing

During the cross-examination of trial counsel Udell, postconviction counsel noted that Udell had some documents before him while testifying. On redirect-examination, postconviction counsel asked Udell what the documents were and Udell replied he had a newspaper, a court opinion, and a facsimile copy of

---

14. In the order denying postconviction relief, the court ultimately rejected all of the testimony of Alfonso, and stated, "In analysis of this claim the court finds Alfonso's testimony not credible because at the evidentiary hearing she first testified to details of family abuse that she failed to reveal in her deposition despite specific inquiry, she offered no explanation for her failure to disclose information at deposition, she refused to admit her advocacy for the defense but later recanted, and she inserted her irrelevant opinions and had to be cautioned by the court. Consequently, for this claim the court does not rely upon Alfonso's testimony." We have explained many times that this Court will not substitute its judgment for that of the trial court on questions of credibility of the witnesses and the weight to be given the evidence. See, e.g., Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997).

documents that he had recently received from Assistant State Attorney Ryan

Butler. When asked, Udell said the fax was a copy of his own trial invoices. Udell

also said that he received a letter from the Assistant State Attorney. When

postconviction counsel asked Udell, "And, what did the letter say?" the prosecutor

objected that the letter was work product. After an in camera review, the circuit

court ruled that the six-page, February 10, 2012, letter authored by Assistant State

Attorney Butler and addressed to Jerome Stone, but provided to Robert Udell, was

work product containing the attorney's mental impressions and opinions, and

theories of the case, and for that reason was not subject to review or testimony.

In Evans v. State, 995 So. 2d 933 (Fla. 2008), concerning a similar letter, we

stated:

> In his first issue on appeal, Evans asserts that his due process
> rights were violated when the trial court denied his motion for public
> records. Specifically, Evans sought the disclosure of a letter from
> Assistant State Attorney Lawrence Mirman sent to Diamond Litty and
> Mark Harllee, defense counsel from Evans' trial, which purportedly
> contained responses to areas of questioning to be asked by
> postconviction counsel at the evidentiary hearing. Based on our
> decision in Kearse v. State, 969 So. 2d 976 (Fla. 2007), we affirm the
> trial court's denial.
>
> In Kearse, the assistant state attorney sent the defendant's trial
> counsel, who was listed as both a State and defense witness at the
> evidentiary hearing, a letter in anticipation of the attorney's testimony.
> The letter contained the state attorney's "mental impressions" about
> the case and about the ineffective assistance claims that were raised in
> Kearse's postconviction motion. Id. at 988-89. The trial court
> conducted an in-camera examination and ruled that, given the nature
> of the letter and the fact that counsel was listed as a witness for both

parties, the letter was attorney work product exempt from disclosure. See id. at 988. We held that the letter "clearly fits within the exemption of attorney work product prepared with regard to the ongoing postconviction proceedings" and affirmed the trial court's decision. Id. at 989.

Contrary to Evans' contention that the letter went beyond mere witness preparation, the State is correct that the letter contains nothing more than the state attorney's impressions of the pending litigation. As in Kearse, the letter here was written by an agency attorney, contained his mental impressions about the claims raised in the postconviction motion, and was produced exclusively for the pending evidentiary hearing as contemplated in section 119.071(1)(d)1, Florida Statutes (2007). 969 So. 2d at 989. Accordingly, we affirm the trial court's denial.

Evans, 995 So. 2d at 941-42 (footnote omitted). In this present case, the matters contained in the letter were in the nature of attorney's mental impressions, opinions, and theories of the case, just as in Evans and Kearse. Where, as here, the letter contains attorney work product with regard to the postconviction claims, the same principles applicable in Evans and Kearse would apply to bar disclosure of the letter written in anticipation of litigation or preparation for trial. Thus, the circuit court did not err in finding this letter was work product and not subject to examination or testimony.

### III.  CLAIM OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Claims of ineffective assistance of appellate counsel are appropriately raised in a petition for writ of habeas corpus, as Hayward has done in this case. See Jackson v. State, 127 So. 3d 447, 476 (Fla. 2013). The alleged error must first be

of "such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance" and, second, the deficiency in performance must have "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Id. (quoting Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986)). Further, "appellate counsel will not be deemed ineffective for failing to raise a claim that is without merit." Id. (citing Freeman v. State, 761 So. 2d 1055, 1070 (Fla. 2000)).

Hayward contends that appellate counsel was deficient in failing to raise a fundamental error claim on direct appeal asserting that Hayward was denied due process by the admission of the testimony of Roosevelt McDowell, who Hayward contends was not qualified to be a witness in the case. For the reasons we discuss below, we find no merit in this claim.

A witness is incompetent to testify if the witness is unable to communicate to the jury, unable to understand the duty to tell the truth, or is unable to perceive and remember events. Rutherford, 774 So. 2d at 646. If the issue is not preserved by trial counsel, appellate counsel is only deficient in failing to assert it on appeal if it is fundamental error; and fundamental error is error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have

been obtained without the assistance of the alleged error." Id. (quoting Urbin v. State, 714 So. 2d 411, 418 n.8 (Fla. 1998)).

A witness is presumed competent to testify until the contrary is established. Hawk v. State, 718 So. 2d 159, 162 (Fla. 1998); see also § 90.601, Fla. Stat. (2007). Section 90.603, Florida Statutes (2007), provides that a person is disqualified as a witness if the person is incapable of expressing himself or herself concerning the matter or is incapable of understanding the duty to tell the truth. Section 90.604, Florida Statutes (2007), provides that a witness may not testify to a matter unless sufficient evidence, which can include the witness's own testimony, is introduced to support a finding that the witness has personal knowledge of the matter. We explained in Kennard v. State, 28 So. 858 (Fla. 1900), "Where, however, a witness has knowledge of the facts, and speaks from a recollection of the facts as they actually appeared to him, though his impression may not amount to positive assurance, it is competent to be considered by the jury." Id. at 859. Hayward has cited no authority for the proposition that lack of clear memory on every aspect of the incident, for example by McDowell's conflicting accounts of whether the assailant wore a hat or not and whether the witness was heading to the bathroom or had already been when shots were heard, is sufficient lack of recollection to entirely disqualify a witness. Other aspects of McDowell's

testimony were firmly recalled and recounted for the jury, and in some instances corroborated by other evidence.

McDowell was an older man with health problems who, in the middle of the night, heard gunshots and looked out his door. He heard the victim make the statement, "I don't have no more." McDowell exhibited some uncertainty or confusion about whether he was on his way to the bathroom or had already been, and about whether the shots had minutes between them or just seconds. He gave differing accounts of whether the assailant had on a hat or a mask. Even so, his testimony never wavered that he heard the victim say several times, "I don't have no more." He never wavered that the assailant went into the car and also went under a streetlight and appeared to examine his hand. He was not confused about which direction the assailant took when he left the scene, and that the victim also left the scene. Other evidence confirmed that the victim shot at the assailant and that the victim left the scene before dying, and that the assailant's blood was found on a post behind McDowell's apartment house, in the direction that McDowell testified the assailant fled. Other evidence also confirmed that Hayward's blood was found in the victim's pockets and on the car.

The discrepancies in McDowell's testimony did not prove that he failed to observe or could not recall the most important points about which he testified. Hayward is correct that the trial court relied on McDowell's testimony that

Destefano said "I don't have no more" in finding that the murder occurred during a robbery for pecuniary gain.  However, that aspect of McDowell's testimony never wavered.  Although McDowell was older, in poor health, and possibly confused about some aspects of the event he witnessed, that does not provide a basis to disqualify him.  See, e.g., Belcher v. Johnson, 834 So. 2d 422, 422-23 (Fla. 2d DCA 2003) (holding that an elderly woman with dementia is not disqualified as a witness simply for those reasons).  Even insanity of a witness has been found to affect only the witness's credibility, not their competence to testify, if the witness can otherwise observe, recall, and relate what they have seen, and if they know the meaning of the oath to tell the truth.  See, e.g., Zabrani v. Riveron, 495 So. 2d 1195, 1198 (Fla. 3d DCA 1986).

As noted above, appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims on appeal.  Even if error had been shown in the admission of testimony of McDowell, such error does not "reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Jackson v. State, 983 So. 2d 562, 576 (Fla. 2008).  Thus, appellate counsel had no obligation to raise a claim that was unpreserved and did not constitute fundamental error.  Accordingly, the writ is denied.

# IV. CONCLUSION

For all the foregoing reasons, the order of the circuit court denying postconviction relief is affirmed and the petition for writ of habeas corpus is denied.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

<u>Two Cases:</u>

An Appeal from the Circuit Court in and for St. Lucie County,
        James Walter McCann, Judge - Case No. 562005CF000436AXXXXX
And an Original Proceeding – Habeas Corpus

Neal Andre Dupree, Capital Collateral Regional Counsel, Southern Region, Paul Edward Kalil, Assistant Capital Collateral Regional Counsel, Southern Region, and Elizabeth Tandiwe Stewart, Staff Attorney, Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

        for Appellee/Respondent